ARTHUR O. CHOATE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102064. Promulgated November 5, 1941.

*Harry W. Forbes, Esq.*, for the petitioner.
*Walt Mandry, Esq.*, for the respondent.

### OPINION.

OPPER: By this proceeding petitioner challenges a deficiency of $2,789.45 in income tax for the year 1937.

The only question for our consideration is whether petitioner realized taxable income by reason of his receipt of rights to subscribe to preferred stock of a company in which he held common stock.

The case was presented on stipulation of facts and the facts so stipulated are hereby found accordingly. The return for the period in question was filed with the collector for the second district of New York.

The stipulated facts show that on or about May 28, 1937, petitioner, by reason of his ownership of shares of common stock of the Crane Co., received 10,000 rights to subscribe on or before June 17, 1937, to a new issue of 5 percent cumulative convertible preferred stock at its par value of $100 per share. The new stock was convertible into common. It was subject to outstanding 7 percent preferred stock, but was preferred to any other class of stock as to dividends and liquidation. The Crane Co. had an agreement with underwriters to subscribe at $100 per share for any of the new issue not taken by the common stockholders. The fair market value of

the rights received by petitioner, at the time petitioner received them, was $4,375 (i. e. $.4375 per right). It is this amount which respondent has added to petitioner's taxable income for 1937.

On June 15, 1937, petitioner delivered all of his rights to various members of his family as a gift and on June 17, 1937, the donees exercised almost all of them.

On June 1, 1937, the first day upon which the rights were dealt in upon the New York Stock Exchange, sales were made at prices varying between $.25 and $.34375 per right and there were sales of the new preferred stock on a when-issued basis at an average price of approximately $104. On June 15 and 16, 1937, the last day on which the rights were quoted on the Exchange, their average price was $.02033 per right and there was a cash sale of such rights at less than 1 cent per right. On June 15, the average price of the new preferred stock upon a when-issued basis was 100½ and on June 17, its average price on the when-issued basis was 100 3/16.

This proceeding raises the same question as that disposed of in *Helen Whitney Gibson*, 44 B. T. A. 950. No contrary contention is made on petitioner's behalf. On the authority of that case, therefore, respondent's determination is sustained.

Although conceding that the two cases are identical in principle, petitioner filed a supplemental brief subsequent to the Board's decision in the *Gibson* case, in which he urged that that decision is erroneous and should be reconsidered. He suggests that the facts shown by the present record exemplify important practical considerations which should lead to a contrary result. Specifically it is urged that where, as here, the market value of the stock rights received by the taxpayer declines materially before they are exercised or disposed of, it is not justifiable to hold that petitioner received income in the larger amount.

Accepting the principle of the *Gibson* case, however, it would not necessarily follow that in a situation where the facts do not justify it the result criticized by petitioner would be necessary. Once it is decided, in accordance with the *Gibson* case, that a common stockholder entitled to rights to subscribe to preferred stock has thereby received taxable income, the question of evaluating those rights for tax purposes automatically reveals itself. This is the imperative question in any situation where income is received in the form of property and determination of the taxable income depends upon the value of the property so received.

It may be that if the record permitted it we could examine all the circumstances surrounding the transactions in these rights and determine as an issue of fact what was their fair market value in petitioner's hands. This would not necessarily be confined to a consideration

of stock exchange prices on any particular day. "Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value." *Heiner* v. *Crosby* (C. C. A., 3d Cir.), 24 Fed. (2d) 191. See also *Estate of Leonard B. McKitterick*, 42 B. T. A. 130; *Estate of Millie Langley Wright*, 43 B. T. A. 551, 555. Since rights to subscribe are ordinarily subject to exercise or sale within a limited period, it may well be that such transactions can be considered either forced sales, or sales in a restricted market, or perhaps both. Or the peculiar character of such arrangements may justify an independent rule. In any event, it hardly follows that the principle laid down in the *Gibson* case and applied here is incorrect, because of a criticism limited to the determination of value which is no more than a subordinate element of the ultimate result.

The question so raised, however, need not and in fact can not be decided upon this record. The parties have stipulated that "The fair market value of the said rights received by the petitioner, at the time the petitioner received them, was $4,375 * * *." This disposition by the parties themselves of the factual issue of value removes it from permissible consideration by the Board. Determination of the incidental matter of valuation in a stock rights case must accordingly be reserved for a proceeding in which it is appropriately presented.

*Decision will be entered for the respondent.*